# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BARRY BRADY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:14-cv-1751** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **JAMES HENRY, in his official capacity as THE** | ) | |
| **COMMISSIONER OF THE TENNESSEE** | ) | |
| **DEPARTMENT OF CHILDREN'S** | ) | |
| **SERVICES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

The defendant has filed a Motion to Dismiss for Failure to State a Claim under Rule

12(b)(6) (Docket No. 8), to which the plaintiff has filed a Response in opposition (Docket No.

11), and the defendant has filed a Reply (Docket No. 14). For the reasons stated herein, the

motion will be denied.

## BACKGROUND

This case concerns alleged procedural unfairness by the Tennessee Department of

Children's Services ("DCS") in identifying and listing individuals as perpetrators of child abuse

or child sexual abuse without a fair hearing. DCS has promulgated the "Rules of the Tennessee

Department of Children's Services – Child Protective Services," Chapter 0250-07-09, codified at

Tenn. Comp. R. & Regs. 0250-07-09 (the "Rules").[1] The Tennessee Uniform Administrative

Procedures Act ("UAPA") governs reviews of agency decisions, including the type of DCS order

---

[1] The Rules include Chapter 0250-07-09-.01 through 0250-07-09-.12, including subparts. For
ease of reference, the court will refer to particular rules as "Rule .01[subpart]."

at issue here.  Before discussing the plaintiff's alleged facts, the court will outline the relevant DCS Rules and provisions of UAPA as they relate to DCS orders.

## I.  **Indication and The DCS Rules**

### A.  DCS's Duty to Indicate

Tennessee law requires DCS to investigate reports of child abuse and child sexual abuse and to determine, within sixty days, "whether the report of abuse was indicated or unfounded and report its findings to the department's abuse registry."  Tenn. Code Ann. § 37-1-406(a) and (i); *Fitzpatrick v. State Dep't of Children's Servs.*, 2014 WL 1092368, at *3 n.2 (Tenn. Ct. App. Mar. 18, 2014) (quoting Tenn. Code Ann. § 37-1-406(a)).  DCS has adopted the Rules to implement this statutory mandate.

Under the Rules, DCS can identify and publish on a registry any person who engaged in "child abuse" or "child sexual abuse" as defined in Rule .01(4).[2]  After a DCS investigation of a report of abuse, a person may be "indicated" as the perpetrator of child abuse.  Rule .01(9); *Fitzpatrick*, 2014 WL 1092368, at *3 n.2 ("The term 'indicated' is defined as 'the classification assigned to an individual found to be a perpetrator of abuse, severe child abuse, child sexual abuse, or neglect as a result of investigation of a report of abuse.'") (quoting Rule .01(9)).

### B.  Initial Investigation and Indication

---

[2] The Rules generally relate to several forms of abuse or neglect of children, including "child abuse" and "child sexual abuse," among others.  Brady alleges that DCS indicated him as the perpetrator of child sexual abuse.  "Child sexual abuse" includes, *inter alia*, criminal acts of fondling or "carnal knowledge" of a child, penetration by a penis of the vagina or anus of another person, use of an object to penetrate another person's genitals or anal opening, intentional exposure of the perpetrator's genitals in the presence of a child, or the sexual exploitation of a child.  Rule .01(4); *see also* Tenn. Code Ann. § 37-1-602 (providing statutory definition of child sexual abuse).  Here, for ease of reference, the court will refer to indications of "child abuse," but the Rules and statutes at issue also relate to "child sexual abuse."

After DCS receives a report of child abuse, it can "indicate" that the person is a perpetrator of child sexual abuse based on its internal assessment of the report and any other evidence it collects.  A report made against an alleged perpetrator is classified as "indicated" if the "preponderance of the evidence, in light of the entire record, proves that the individual committed . . . child sexual abuse[.]"  Rule .05(1).

Proof of one or more of several factors "may constitute a preponderance of the evidence," including information from a medical professional supporting the report of abuse, an admission by the perpetrator, the statement of a "credible witness," the child victim's statement that abuse occurred, physical indications of abuse, other "[p]hysical evidence" that could impact the classification decision, behavioral patterns reflecting abuse, or other "circumstantial evidence" of abuse.  *Id.*[3]  It appears that all investigations must include certain investigatory steps, including, *inter alia*, a visit to the child's home, an interview with and physical observation of the child, and an interview with the parents or guardians of the child.  *See* Tenn. Code Ann. § 37-1-406(e).  The investigation must also include determinations concerning the nature, extent, and cause of the harm, the names and conditions or other children in the home, the identity of any other people in the household, and "[a]ll other pertinent data."  *Id.* § 37-1-406(d).

### C.  Formal File Review as a Form of "Due Process"

The Rules purport to provide a form of "due process" to individuals indicated as perpetrators of child abuse.  Rule .01(13).  After a report is "indicated," DCS contacts the alleged perpetrator to inform him of the indication and to inform him of his right to "a formal file review

---

[3] In cases of child sexual abuse, Tennessee requires that the investigation be conducted by a special child protective investigation team (*see* Tenn. Code Ann. § 37-1-406(b) (incorporating Tenn. Code Ann. § 37-1-602)).

by the Commissioner's designee to determine whether the report has been properly classified as 'indicated.'" Rule .06(1).[4]   The DCS notice must, *inter alia*, indicate that (a) the individual "has been classified as the perpetrator of abuse . . . in an 'indicated report' investigated by the Department;" (b) the individual may request a "formal file review by the Commissioner's Designee" within 10 days of the date of the notice; and (3) the failure to request a formal file review within 10 business days, absent a showing of good cause, results in the classified report becoming final. Rule .06(4). While that 10-day period is pending, DCS must not disclose that the individual has been classified as the perpetrator of child abuse, although it may confirm that an "investigation has commenced." Rule .06(7).

If the alleged perpetrator timely responds to the notice by requesting a formal file review, DCS mails the person a notice of the individual's obligations in the formal file review process. Rule .06(6). The notice must inform the individual that (1) he has the right to submit "additional written or documentary information on his or her behalf" within 30 days, and (2) the review will be completed within 90 days of the date on the notice. *Id.* "[T]he Commissioner's designee" thereafter determines whether the evidentiary standards set forth in Rule .05, which are the same standards applicable in the initial indication process, have been met. Rule .06(8).

Thus, as the court understands the process, the Commissioner's designee (whoever that may be) essentially conducts a *de novo* review of the case file, perhaps with the benefit of any documents timely produced by the alleged perpetrator. If the designee determines that the Rule .05(1) evidentiary standard has not been met, the initial report is reversed, the report is classified

_____

[4] For ease of reference only, the court will refer to the hypothetical alleged perpetrator as a male.

as "not indicated," and DCS does not release information about the report.  Rule .06(9).[5]  On the

other hand, if the designee determines that the Rule .05(1) evidentiary standard has been met, the

report "shall be upheld and it shall be classified as 'indicated'."  Rule .06(11).

The Rules characterize the formal file review process as the "initial form of due process"

that was "established pursuant to 42 U.S.C. § 5106(a)(b)(2)(A)(xv)(II) that is available to an

individual whom the Department identifies or proposes to identify as a perpetrator of abuse[.]"[6]

Rule .01(13).  Here, the State has not identified any requirement that, in connection with the file

review, DCS inform the alleged perpetrator of the evidence on which DCS has relied, the nature

of DCS's investigation, or how DCS reached its conclusions.  Furthermore, the defendant has not

identified any requirement that DCS disclose the source of its initial report to the alleged

perpetrator.

### D.  Right to Hearing in Defined Circumstances Only

The next step in the review process varies based on how DCS intends to utilize the

indication following a formal file review.  By way of background, the UAPA defines a

"contested case" as "a proceeding, including a declaratory proceeding, in which the legal rights,

---

[5] Even in that circumstance, DCS is not required to expunge its internal records related to that particular report.  Rule .06(9).  That rule is not at issue here.

[6] The cross-reference to the United States Code appears to be incorrect.  The correct provision is 42 U.S.C. § 5106a(b)(2)(B)(xv)(II).  That part of the U.S. Code generally relates to grants to states for child abuse or neglect prevention or treatment programs.  The specific provision cross-referenced in Rule .01(13) provides that each state must submit a plan to the federal government that includes "provisions, procedures, and mechanisms . . . (II) by which individuals who disagree with an official finding of child abuse or neglect *can appeal such finding*."  42 U.S.C. § 5106a(b)(2)(B)(xv)(II) (emphasis added).  Here, Rule .01(13) represents that the formal file review process under DCS rules complies with the statutory mandate set forth in § 5106(b)(2)(B)(xv)(II).

duties or privileges of a party *are required by any statute or constitutional provision* to be determined by an agency after an opportunity for a hearing." Tenn. Code Ann. § 4-5-102(3) (emphasis added). DCS, like other agencies, has adopted certain rules designed to identify when a "contested case" hearing is available.

If DCS intends to release the individual's name under its emergency procedures (described in Rule .11) or in specific non-emergent situations, DCS affords the individual the right to a hearing. Rule .08; *see also* Rule .04(1). Otherwise, the individual does not have a right to a hearing under the DCS Rules.

In non-emergent situations, an individual indicated as the perpetrator of child abuse after a formal file review has a right to a hearing in only two circumstances: (1) DCS "is going to release information" or (2) "the indication will affect [his] employment or any professional license." Rule .08(1). If either of these circumstances apply, the designee must inform the indicated person that he has 10 days within which to request a hearing before an administrative law judge. Rule .06(11)(b)(1). Absent "good cause," failure to timely request a hearing will result in DCS releasing its finding of abuse "to any individual or organization." Rule .06(11)(b)(4).

If the situation is emergent, both the alleged perpetrator and the organization or person with whom the individual is associated are informed of the immediate threat finding, after which the individual may request a hearing. Rule .07; *see also Fitzpatrick*, 2014 WL 1092368, at *3 (indicating that DCS affords a hearing to foster parents accused of neglect, where emergency

procedures were utilized).[7]  If an individual fails to submit a timely request for an emergency hearing, the individual waives the right to a hearing (absent a showing of "good cause" for failure to make a timely request), and DCS's "indicated" report "shall be then available for dissemination to any organization or person with whom the individual is associated and the individual's identity shall be placed in the registry."  Rule .07(5)-(6).

Various conditions attach at the administrative hearing: it must be conducted in accordance with the UAPA (Rule .10(1)); in light of the entire record (including any "relevant and admissible proof [that] the individual offers"), the hearing officer determines whether a preponderance of the evidence proves that the individual committed abuse (Rules .10(2) and .11(1)); and the burden is on DCS to prove that an indication is warranted (Rule .11(2)).  *See also* Tenn. Code Ann. § 4-5-301 *et seq.* (setting forth UAPA procedures for "contested case hearings").

On the other hand, if DCS indicates a person as a perpetrator of child sexual abuse, intends to list the person on the department's registry of perpetrators of child abuse, but "*will not identify* or *does not intend to identify* to any organization or person . . . that it has classified an individual in an 'indicated' report as a perpetrator of abuse," the individual does *not* have a right to a hearing.  Rule .04(2) (emphases added).  Under Rule .03(5), if DCS does not begin procedures to release the identity of (and other information concerning) a perpetrator in an "indicated" report of abuse within two years of the initial classification, DCS may not thereafter

_____

[7] Rule .07(6) specifies that, if an individual timely requests a hearing, DCS must follow the procedures set forth in Rule .08(4).  Therefore, it appears that the limitations on administrative hearings set forth in Rule .08(1) do not apply to emergency procedures.

release any information concerning the report. "This provision shall not, however, require expunction of this information from the Department's internal records." Rule .03(5).

Finally, if an individual classified as "indicated" is the subject of other administrative or civil proceedings that are derived from the same allegations that caused the department to investigate, DCS stays entry of a final order pending resolution in the associated administrative or civil proceeding. Rule .09(1)(b) and .09(2).

### E. The UAPA

The UAPA governs the judicial review of agency orders by Tennessee agencies, including DCS orders. The manner of review depends on whether the agency held a "contested case" hearing under UAPA § 4-5-301 *et seq.*

### 1. Agency Provides a Contested Case Hearing

If an agency has held a contested case hearing, judicial review of the agency's decision (via an ALJ or otherwise) is governed by UAPA § 4-5-322. Under that provision, a person aggrieved by a final decision in a contested case may seek judicial review by filing a "petition for review" in the state Chancery Court within 60 days of the decision. *Id.* § 4-5-322(a)(1) and (b)(1)(B)(i). Upon filing a petition, the agency must transmit to the Chancery Court a full record of the proceedings under review. Unless the court elects to consider additional evidence for good cause shown, the court limits its review to the agency record, the court applies the same legal standard that governed the contested case proceeding under review, and the court (not a jury) rules on the petition. The court may only reverse or modify the decision "if the rights of petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions" meet one of five criteria: (1) they violate constitutional or statutory provisions; (2) they were in excess of the agency's statutory authority; (3) they were "made upon unlawful

procedure"; (4) they were "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"; or (5) they were "[u]nsupported by evidence that is both substantial and material in light of the entire record." *Id.* § 322(e)-(h). A party aggrieved by the Chancery Court's decision may appeal to the Tennessee Court of Appeals, which shall review only the record before the Chancery Court (including the underlying contested case hearing record and any supplemental material considered by the Chancery Court). *Id.* at 4-5-323.

### 2. Agency Does Not Provide a Contested Case Hearing

On the other hand, if the agency does not provide for a contested case hearing, the petitioner has only one path to a form of judicial review, contained within "Part 2" of the UAPA, which concerns "Rulemaking and Publications." UAPA Part 2 set forth rules for agency rulemaking, and states how one or more people can initiate or challenge agency rulemaking. For example: it authorizes certain people "having interest in a rule" to petition an agency for its adoption (§ 201); requires agencies to "precede all its rulemaking with notice and public hearing" (§ 202); sets forth procedures related to public hearings (§§ 203-205); requires the Tennessee Secretary of State to endorse and file agency rules in a publicly available manner (§§ 206, 220, and 221); specifies when and how rules become effective (§§ 207, 215, and 216); outlines emergency and public necessity rulemaking procedures (§§ 208-209); requires the Attorney General to review the legality and constitutionality of every rule (§ 211); indicates how rules may be withdrawn (§ 214); authorizes agencies to adopt "rules of practice" (§ 217); requires agencies to make certain materials available for inspection and copying (§ 218); authorizes the Secretary of State to adopt model rules of procedure (§ 219); and mandates that agencies retain copies of certain records relating to rules and associated public hearings (§ 222).

Section 223 of Part 2, which is preceded by the aforementioned provisions, states that "[a]ny affected person may petition an agency for a declaratory order as to the *validity or applicability* of a statute, rule or order within the primary jurisdiction of the agency." *Id.* § 223(a) (emphasis added). In response to a request for a declaratory order, the agency must either (1) convene a contested case hearing and issue a declaratory order, or (2) refuse to issue a declaratory order.[8] Each agency is required to "prescribe by rule the form of such petitions and the procedure for their submission, consideration and disposition." *Id.* § 223(d).[9] If the agency receives a request for a declaratory order, it must

> (1) Submit electronically to the secretary of state the notice of hearing for publication in the notice section of the administrative register web site and, if a statute applicable to a specific agency or a specific rule or class of rules under consideration requires some other form of publication, publish notice as required by that statute in addition to publication in the notice section of the administrative register web site; and

> (2) Take such other steps as it deems necessary to convey effective notice to other agencies and professional associations that are likely to have an interest in the declaratory order proceedings.

*Id.* § 224(a). Notice to the Secretary of State must include "specific information relating to the declaratory order request," including the petitioner's name and "an explanation of whom such person or entity purports to represent," "[a] summary of the relief requested, including . . . the conclusion or conclusions the petitioner requests that the agency reach following the declaratory proceeding," and "[a] detailed outline and summary of the statutes or regulations that the agency is called upon to interpret or upon which it is to rule." *Id.* § 224.

---

[8] If an agency declines to take action within 60 days, the statute treats the inaction as a refusal to issue a declaratory order. *Id.* § 223(c).

[9] The statute does not explain what consequences, if any, stem from an agency's failure to comply with § 223(d).

Section 225 provides for judicial review of an agency's declaratory order (or the refusal to issue one). Under § 225, "[t]he *legal validity or applicability* of a statute, rule or order of any agency to specified circumstances may be determined in a suit for a declaratory judgment in the Chancery Court of Davidson County . . . if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the complainant." *Id*. § 225(a) (emphasis added). The scope of review is subject to strict limitations: "[i]n passing on the legal validity of a rule or order, the court shall declare the rule or order invalid only if it finds that it violates constitutional provisions, exceeds the statutory authority of the agency, was adopted without compliance with the rulemaking procedures provided for in this chapter or otherwise violates state or federal law." *Id*.

The statute also purports to require an individual to petition the relevant agency for a declaratory order before filing the declaratory petition in Chancery Court. *Id.* at § 225(b). However, the Tennessee Supreme Court held that this provision is unenforceable with respect to a petitioner's facial challenge to the constitutionality (*i.e.*, the "validity") of a statute. *See Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827 (Tenn. 2008).

### F. Plaintiff Brady's Case[10]

Brady is a Tennessee citizen who alleges that DCS, by enforcing the Rules, denied him due process. On August 27, 2013, a DCS employee informed Brady that he had been identified as a person who had committed child abuse or child sexual abuse. On September 3, 2013, Brady requested a formal file review. On January 24, 2014, a different DCS employee informed Brady that the formal file review had upheld the initial classification of Brady as the perpetrator of child

---

[10] Unless otherwise noted, the facts are drawn from the allegations in Brady's Complaint.

sexual abuse.  On February 5, 2014, Brady, through counsel, notified DCS of his request for a hearing to contest his classification as a perpetrator of child abuse.  On February 10, 2014, DSC notified Brady that he did not meet the criteria for an administrative hearing.  The Complaint does not allege the Brady undertook any further actions concerning his classification.

Drawing all reasonable inferences in favor of Brady, DCS never informed Brady of the allegations against him, never disclosed the evidence against him, never afforded him a hearing, and never gave him the opportunity to challenge the unidentified evidence on which DCS relied. Furthermore, after its file review, DCS did not inform Brady of a statutory right to file a declaratory order under UAPA § 225.  In fact, it appears that DCS has not promulgated rules or policies describing the process for filing a petition for a declaratory order, which the plaintiff claims may violate UAPA § 223(d)'s statutory mandate.

Brady alleges that, for various reasons, his status as an indicated perpetrator of child abuse has deprived him of a protected liberty interest.  Brady also alleges that DCS's refusal to grant him a hearing under the Rules has denied him procedural due process, in violation of the federal constitution.  He asks the court (1) to declare that the Rules are unconstitutional, (2) to enjoin DCS from listing him in the child abuse registry, or (3) in the alternative, require DCS to reserve decision and to provide a full and fair hearing with necessary pre-hearing disclosures of information by DCS.

The defendant has moved to dismiss the Complaint, contending that Brady has not alleged a plausible due process violation.

## RULE 12(B)(6) STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## ANALYSIS

Brady alleges that the application of the Rules to him violated his constitutional right to due process. Thus, although not specified by the parties, the court construes Brady as asserting an "as applied" challenge to the Rules as they were applied to him. *See Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000) ("An 'as-applied' challenge consists of a challenge to the statute's application with respect to the party before the court.")

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972). If procedural due process protections attach, a plaintiff can prove a due process violation by showing that he or she was deprived of an opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case. *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971). Due process is not a technical conception with a fixed content unrelated to time, place, and circumstances, but rather is flexible and calls for such procedural protections as the particular situation demands. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

Here, the defendant argues that Tennessee affords Brady due process under § 4-5-223's provision for a declaratory judgment action. The defendant argues that Brady could have obtained meaningful judicial review of his challenge to DCS's indication by (1) petitioning DCS for a hearing, which DCS might have granted, and (2) by following §§ 223 and 225 to obtain review before the Chancery Court, whether or not DCS granted a hearing. Brady contends that a declaratory judgment would not have afforded a meaningful merits review and that, in any event, DCS failed to provide him notice of the procedures for bringing a declaratory judgment petition, as required by § 223(d). Notably, the state does not appear to contend that the formal file review itself constitutes "due process."

In *Wright v. O'Day*, the Sixth Circuit considered an appeal from this court in a case in which DCS had placed a thirteen-year-old boy on the child abuse registry without an administrative hearing. *See Wright v. O'Day*, 706 F.3d 769 (6th Cir. 2013) ("*Wright II*").[11] DCS

---

[11] The original opinion by this court, which was the subject of the appeal in *Wright II*, was set forth in *Wright v. O'Day*, 2012 WL 315401 (M.D. Tenn. Feb. 1, 2012) ("*Wright I*").

initially indicated the minor as a perpetrator of child abuse; the minor requested a formal review and submitted written statements on his own behalf; and the minor was never told the evidence against him. *Id.* at 771. After DCS upheld the classification, the minor requested a hearing, but DCS denied him a hearing based on Rule .08(1), on the grounds that the classification did not affect the minor's employment. *Id.* Without seeking a declaratory order under §§ 223 and 225, the minor filed a lawsuit in this court under § 1983, contending that the refusal to provide him a hearing had deprived him of due process of law. *Id.*

In defending the case, the state did *not* take the position that the lawsuit should be dismissed because the minor had failed to seek a declaratory order (and subsequent review through the Chancery Court) – which is the position it advances here. Instead, the state argued that the minor's case was non-justiciable because his claim of injury was speculative, particularly given the plaintiff's status as a minor. *Id.* After this court initially granted the state's motion, *see Wright I* at *5, the Sixth Circuit reversed, finding that the minor's interest in being free from classification as a child abuser was "sufficiently imminent and concrete" to afford him standing to vindicate his "procedural rights." *Wright II*, 706 F.3d at 772. The Sixth Circuit held that the minor "suffered an injury when Children's Services classified him as a child abuser." *Id.* The Sixth Circuit also found that the DCS rule providing for releasing the minor's information from the registry within two years did not lessen the actual harm, because DCS Rule .03(5) provides that the record would not be expunged, meaning that "the classification as a child abuser is, in effect, permanent." *Id.* at 772.

In *Wright II*, the Sixth Circuit also found that it would be unfair to force the minor to wait for conditions set forth in Rule .08(1) to occur before giving him the right to challenge his classification. *Id.* at 774-75. The Sixth Circuit observed that DCS had already denied the

15

minor's petition for a hearing and that DCS was unlikely to change its decision or to revise its regulations to afford the minor a hearing. *Id.* at 774. Given the "finality" of the DCS decision, the court found that the minor's claim was ripe, because "[t]he courts are certainly capable of reviewing [the minor's] classification and determining whether [he] should be afforded an administrative hearing now, rather than in the future." *Id*. at 774.

After remand, this court considered whether the plaintiff had been deprived of a protected liberty interest – an issue left open by the Sixth Circuit on appeal. *Wright v. O'Day*, 2013 WL 3283484 (M.D. Tenn. Jun. 28, 2013) ("*Wright III*"). This court concluded that the minor *had* been deprived of a protected liberty interest, thereby entitling him to the protections of procedural due process. *Id.* at *5-*7. In its analysis, the court outlined numerous restrictions to which an individual listed on the registry is subject, including mandatory disclosure by the individual (not just DCS) when seeking certain forms of employment. *See id.* at *6. The court observed that, on the day before being listed on the registry, "the world was [the minor's] oyster employment-wise, a world in which he had the right to pursue any of the common occupations of life, including working in Tennessee at a child care or adult care center, or operating such a center. That right was effectively lost by operation of law when his name was placed on the child abuse registry the following day." *Id.* at *6. Following the Sixth Circuit's suggestion on appeal, this court concluded that the fact that "DCS *may* not release information regarding [the minor's] placement on the registry after two years (as the state argues) is not an answer to whether placement on the list *ab initio* without a hearing violates due process, and, in any event, ignores [the minor's] argument that placement on the registry itself is a lifelong scarlet letter because he will forever be required to report his placement on the list." *Id.* at *7.

The court strongly suspects that, prior to *Wright II* and *Wright III*, DCS was operating under the assumption that no cognizable deprivation of liberty occurs *unless and until* an the identity of the individual listed on the child abuse registry is about to be disclosed (including in emergent situations), or the indication would have an immediate effect on the person's current employment or professional license. While both of those circumstances certainly constitute examples of a deprivation of liberty to which due process protections attach, *Wright II* and *Wright III* indicate that they are not exhaustive. Indeed, as this court found in *Wright III* – and as the Sixth Circuit suggested in *Wright II* – merely being listed on the child abuse registry, without more, *does* give rise to a potentially actionable claim of injury. In light of *Wright III*, which the defendant has not challenged here for purposes of the motion, it is difficult to see why the distinctions drawn in Rule .08(1) (between those who are afforded a hearing and those who are not) are meaningful and can withstand constitutional scrutiny as a matter of due process. Thus, assuming that the court's conclusion in *Wright III* was correct, Brady has a plausible claim that Rule .08(1) improperly denies a hearing to individuals who have been deprived of a protected liberty interest.

The court is not yet persuaded by the state's argument that Brady cannot state a claim because he never sought a declaratory order. First, according to the Complaint, DCS denied Brady a hearing on the basis that he did not meet the criteria set forth in Rule 08(1). The Rules require a person to request an administrative hearing within 10 days of the completion of the formal file review, and they specifically state that a hearing only applies to emergent situations or situations in which DCS plans to release the information or it will affect Brady's employment. Brady did not fit either of these criteria, so it is not surprising that DCS denied him a hearing. The defendant seems to take the position that, after receiving the denial of a hearing, Brady was

17

required to *re-petition* DCS for a hearing. DCS points to no authority indicating that DCS was required to, or otherwise would have, granted him a hearing at that point. For that matter, the defendant has not identified any example in which DCS actually has granted *anyone* a hearing under Brady's circumstances. Drawing reasonable inferences in favor of Brady, there is no reason to believe that DCS would have reversed its decision in response to a declaratory order petition from Brady.

Second, utilizing the declaratory order process is at best an awkward fit in the adversary context presented here. Part 2 of the UAPA generally relates to rulemaking itself, and § 223 permits a person to petition for a declaratory order to challenge the *validity or applicability* of a statute – considerations that do not squarely relate to the merits of the underlying proceeding. The process seems designed to address legal issues relating to the scope of authority of an agency to issue a particular type of order under applicable statutory or constitutional law, rather than to provide for a substantive review of the merits of the agency's decision in a particular case. For example, when an agency receives a declaratory order request, it triggers notice disclosures to the Tennessee Secretary of State and numerous potentially "interested" third parties, including "other agencies and professional associations that are likely to have an interest in the declaratory order proceedings." The notice requires, among other things, a detailed summary of the statutes or regulations that the agency "is called upon to interpret or upon which it is to rule." These procedures make little sense in a case involving a single person's potential designation on a child abuse registry by DCS. A more plausible construction of §§ 223 and 225 is that the UAPA contemplates a declaratory judgment action that involves a determination as to whether an agency has appropriately *construed a law*, not whether the agency has made a valid decision in a particular case otherwise within its jurisdiction. *See, e.g., Morris v. Correctional*

*Enters. of Tenn.*, 1997 WL 671988 (Tenn. Ct. App. Oct. 29, 1997) (finding that filing for a declaratory order and seeking judicial review through a § 223 declaratory action was the proper means to challenge whether an agency properly concluded that the plaintiff was not a career service employee and, therefore, was not entitled to any federally protected property interest in his job).

By way of contrast, judicial review of contested case hearings by the Chancery Court specifically includes five categories of review, including three relating to the agency's authority (Tenn. Code Ann. § 4-5-322(h)(1)-(3)) and two relating to the *merits* of the agency's decision (*id*. §§ 322(h)(4) (reversal warranted if decision was "arbitrary and capricious" or an "abuse of discretion") and (5) (reversal warranted if findings "unsupported by the evidence")). On the other hand, under § 225, judicial review of declaratory orders is narrower: the enumerated grounds for review do not include any merits-based grounds for review of the agency's findings; instead, they only concern issues relating to the "applicability" or inherent "validity" of the order itself. Although the defendant argues that no statute appears to preclude the Chancery Court from addressing the merits of the agency's determination and providing discovery to the indicated person, the defendant has not persuaded the court that the UAPA should be construed as requiring Chancery Courts, as a matter of course, to conduct first-line hearings in child abuse indication cases.[12] The structure of the UAPA strongly suggests that the UAPA is designed to force most first-line proceedings to take place at the agency level, with judicial involvement limited to review of the record developed before the agency.

---

[12] The defendant has not cited any case in which the Chancery Court has conducted this type of hearing.

Third, to the extent that the defendant is arguing that Brady's right to due process would be vindicated by a Chancery Court finding that due process requires a hearing, this argument is circular and arguably inconsistent with the state's position that Brady should have re-petitioned DCS for a hearing by seeking a declaratory order.  As a matter of law, Brady was not required to petition an agency regarding the constitutional validity of its own rules in the first place.  *See Morgan*, 263 S.W.3d at 853-54 ("When challenging the facial validity of a statute on constitutional grounds, a plaintiff need not exhaust administrative remedies under the Uniform Administrative Procedures Act prior to a suit for declaratory judgment.").  Furthermore, it is inherently circular to argue that Brady's right to due process would be vindicated by a court's finding that he had been deprived of due process in the first place.  The Chancery Court's review presumptively would be limited to a finding that the order itself was invalid for lack of due process, at which point it would likely order a hearing to take place (rather than conduct the hearing itself).

Fourth, there is, as yet, no indication that DCS actually believes that an aggrieved recipient in Brady's position should utilize the declaratory order procedure to vindicate his right to due process.  The Rules characterize the formal file review as a form of "due process," but that review patently does not constitute procedural due process.  During the file review, the recipient is not entitled to see the evidence against him, to know the identity of the people who have accused him of child abuse, or to confront adverse witnesses.  As the court understands the process, the indicated person essentially must submit documentary evidence on his own behalf "in the blind," without necessarily knowing what information must be rebutted.  Moreover, the Commissioner's designee makes a unilateral determination about whether to uphold the initial indication, without making any legal findings subject to public disclosure other than the

indication itself. Tellingly, DCS has no procedures in place for aggrieved indicated persons to file for a declaratory order, the defendant has not provided any examples in which DCS has reversed its refusal to grant a hearing in circumstances not subject to the Rule .08(1) restrictions, and the defendant has not shown that DCS typically litigates the merits of child abuse indications in Chancery Court outside of the contested case review process. Moreover, it seems inherently unfair to require an indicated individual to appeal to the Chancery Court without limited knowledge, or perhaps any knowledge, as to how DCS reached its conclusion. Indeed, the individual might not even know whether DCS followed the required statutory procedures in its investigation, let alone whether the evidence supported DCS's unilateral conclusion.

Taking these considerations cumulatively, the court cannot say that Brady has failed to state a plausible claim that his due process rights have been violated, at least at this early stage in the case. In light of *Wright II* and *Wright III*, it may be that due process required DCS to provide Brady a contested case hearing and that, as a consequence, Rule .08(1) is unconstitutional to the extent it deprives individuals indicated as child abusers the right to a contested case hearing. The court reserves judgment on the ultimate question of whether Brady's due process rights were in fact deprived, as it may be that the defendant will be able to produce examples that contradict the court's construction of the statutes and Rules. Furthermore, the court expresses no opinion as to whether *Wright III* was correctly decided, an issue that the defendant has preserved.

### CONCLUSION

For the reasons stated herein, the defendant's Motion to Dismiss will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

21